This case involves two petitioners, a brother and sister, who faced lifetime persecution because of their Baha'i faith. Their parents were severely persecuted, beaten, arrested, and in fear of death, they fled, came to the United States and received asylum. These two petitioners also had particular persecution in addition to their family persecution, and by the way, the judge failed to weigh at all the family persecution, which is reversible error in itself. They were thrown around, beaten, suffered injuries to their back, and— Let's do it. Brother and sister. Okay. What injuries did the brothers— Martik suffered an injury to his back in 1995 when he was thrown by the officers against a chair and a nail. It tore his back. He also was beaten daily when he was— Wait a minute. Was there any medical evidence of what that amounted to? Did he go to a hospital? I think he went to a hospital or doctor and he didn't have any records. The records weren't available or he didn't ask for them, but he did have a picture of the scar and the scar was still there. But he didn't testify as to what the injury was. I mean, it was an injury to his back, but what was the injury? That injury to his back, it was torn by a nail when he was thrown against a chair, and he did testify to that, Your Honor. And in addition, he testified that he was taken into the military beaten daily and threatened with death. Only got out temporarily because of a bribe, but they were going to take him back in when he recovered from his injuries. So he was— I'm sure you recognize a statement like, I was taken to the military beaten daily. Was it that general a statement? Was there any specifics to it? Yes, there were specifics, Your Honor. He talked about how he was first taken and threatened by one group and told that he was an animal and shouldn't survive. And then he was taken by his officer and told that he had to put a gun together. And under his religion, he can't touch a firearm. When he said that, they started to beat him. And they also kept him without sleep, made him do double or triple duty, and they beat him daily. And this evidence— How many days? How many days? He was there for two weeks, Your Honor. And this evidence is completely consistent with the country reports, Your Honor, which report that this kind of treatment is given to minority, especially minority religious members in the military in Armenia. And the girl also testified to her being beaten several times when she was at Baha meetings. She suffered injuries to her back, whether her shoulder or her hip, parts of her back. Hospital? No, she didn't go in the hospital, Your Honor. If they go to the hospital, then the police come. Then they are again taken into custody. So they avoid going to the hospital in Armenia. Did they have a doctor come and see them? No, they didn't, Your Honor. The mother treated them. Any interaction with the authorities in Armenia is likely to— But how about—is the doctor an authority? I beg your pardon? Is the doctor an authority? Didn't they have any doctors that they could call on? She didn't get a doctor. No, Your Honor. The mother treated them. All right. Yes. But Your Honor, these individuals don't even have to show that they were particularly persecuted because their family was persecuted. Family persecution under the Hernandez case that I cited in my rebuttal brief is sufficient even if they don't show any particular persecution. And the persecution in this case, the judge used the wrong standards, both in finding that there was a one-year bar. First of all, they both applied for asylum within a year. They applied on I-730, which is an asylum petition. Even though it's a different asylum petition than the government wants, it's not required by the statute. And the male petitioner applied in a credible fear hearing for asylum. He was told by the government repeatedly, and he told the name Turviana of the officer, that he was granted asylum, so there was no need for him to file further asylum. So both of them, the judge applied the wrong standards. The only standard for proof for them that they had an exception was reasonable proof. In addition, the holdings of this court are controlling Verdiana versus Holder and other holdings of this court that when there is, that the ineffective assistance of counsel is exceptional circumstances. So under all of these, this case should be remanded just for the finding on the one-year bar. There should be no one-year bar, either because they filed for asylum in a timely fashion or because they had a reasonable explanation. The wrong standard was that the IJ required preponderance of the evidence and the BIA required pure, overwhelming evidence. The only evidence that they needed, their standard of evidence, was a reasonable explanation. And they explained that they had ineffective assistance of counsel, which is controlling under Verdiana, and that they were relying on the government, which told them that they had asylum. I also want to address the asylum on the merits, Your Honor. The wrong standards, the wrong legal standards also were applied here, and this case should be reversed. First of all, the minimal evidence of proof that was necessary, because they were a disfavored class. And under the Tambuling case, which I cite, the Tambuling case versus Holder, the 2010 case that I cite in my additional brief, holds that the court must have weighed the disfavored group evidence, which the judge acknowledged there was, that the Baha'is are being beaten and tortured in Armenia, just consistent with their testimony. That evidence should have been weighed with the personalized risks. You know what? A problem that you've got, and maybe you can solve it. Would love to, Your Honor. Let's assume you're right, that there's some problems with Armenians. The brother and the sister each got to say whatever they wanted to say in terms of what hurt them. So you're not suggesting anybody kept them from making their record, are you? No, Your Honor. But they had a minimal level of proof, and the wrong standard of proof was applied. So they made their record, and you are suggesting that there would have been a different result if the right standard, let's assume the court would agree with you, that the wrong standard was applied. Don't you have to go one step further than that to show that the result would have differed if the right standard? Absolutely would have. First of all, Your Honor, as I said, they don't have to show any personal persecution to them under the Hernandez case or under the Julin case. Your time hasn't run down, and if you let me ask the question, you will answer it. Now go ahead then. Go ahead. Okay. Well, yes, Your Honor. If the right standard is applied, they had a minimal proof level, and the minimal proof level, they testified credibly, Your Honor. The court found that their testimony was not credible, but the basis for the court's findings were unreliable. The court found that it was because they didn't know exactly how many people beat them. Well, nobody would know how many people beat them when they're on the floor with their hands over their heads. And they said from the beginning they weren't sure how many. You don't want to mistake the court. What they did was say at one time six people beat them. Actually, Your Honor, what they said is, I don't know how many people, and then the government pushed them and said, well, make an estimate, and they said, well, maybe six, maybe ten. The thing is, they said, we don't remember how many people, and nobody would. Even if there were ten witnesses, each of them would have said differently how many people there were. This is not going to the heart of the case. The heart of the case is that these people were persecuted for their Baha'i religion, that their testimony was credible, that these are not inconsistencies that go to the heart of the case, and they're minimal. Nobody remembers the exact number of people when there's a lot of officers charging at them. The other thing was whether they were Yoruba or they were Fides. Well, they're both military. Who would know the difference? And they didn't sit with a notebook and count them. These are not substantial inconsistencies, and they don't, they're not inconsistencies at all, and they don't go to the heart of the claim. Excuse me, didn't they at some time differentiate between who did what? Actually, Martik testified very clearly that there really was no difference between the Fides and the Yoruba, and they couldn't be differentiated. They're all military. And if you look at the substantial evidence in the record, it explains that the Fides are military and the Yoruba are paramilitary, former military, acting as military. So a 14-year-old boy couldn't possibly, at a time he's being beaten, distinguish how many of each. Maybe they tried to guess because the government kept saying, well, how many do you think? It's not material, Your Honor. It's not material to their claim or to their fear level, how many people beat them each time. What's material is that they were repeatedly, their family was persecuted, beaten. Their parents were arrested, threatened with death. They were threatened with death, and they had to flee the country. That's what's material. Not how many people beat them in which uniforms. So I want to keep some time for my rebuttal, Your Honor. I want to, again, focus on the burden of proof, which is minimal in each case, and in which that was not accredited, the correct burden of proof. And for that reason alone, this should be reversed. Also because of the Verdiana case, which is controlling, to reverse it because of the What should we do? What should be the remedy? What you should do, Your Honor, is very clear. You should reverse this case and send it back because the judge applied the wrong standards. You should find that the testimony was credible because any inconsistency sounded by the judge were minimal or inconsequential and didn't go to the heart of the case. You should reverse the finding that there was a, you should find that there was an exception to the rule or that there was a timely filing within a year or that there was an extraordinary exception. Do you cite a case to us where the Court of Appeals has decided that witnesses were or were not credible? I'm sorry, where the Court of Appeals has cited what? That witnesses were or were not credible. Yes, I cited many cases. First of all, the judge required We decided based on what? What does the Court of Appeals, how can the Court of Appeals decide? We can decide that somebody erred in saying that they were not credible based on whatever reason they gave, and that's a question we're going to discuss. Yeah, I cited many cases in my brief for the fact that these minor inconsistencies should not stand, and I will cite them in my rebuttal. You don't have to. We are more than familiar with this case because that's our obligation. That's right, Your Honor. But what I was asking you, and that's all I'm asking, you ask us that, all right, we should reverse and we should remand. And when we remand, we should say these witnesses were credible, and that was the only thing I was telling you. Yes, and the law is, Your Honor, that if the... We are not going to be able to say whether they are or not, but we can say the basis that you gave for finding them not credible is not sufficient. Exactly, Your Honor, and then because of that, they must be found credible. Thank you, Your Honor. Don't worry, you still have time for your rebuttal. I want my rebuttal, thank you. Maybe I should wait until you get started to tell you a problem that I hope you plan to address. Well, I say I hope, it's up to you. It's up to you, Your Honor. You can wait until I get started or you can bring it up at the outset. The problem you've got here is that you found these young people to not be creditable. Correct, Your Honor. And many of the things that you rely on were identical to the things that could have been relied on in their parents' situation, and yet their parents were granted asylum. Well, first of all, Imran Zaidi again for the response, Your Honor. Do you follow my questioning? My problem is, if it wasn't sufficient to block the parents, what makes it suddenly sufficient to block the children? First of all, good morning, and again, Imran Zaidi for the response. And you can tell me, maybe I've got the facts confused, but I don't think so. I believe you do, Your Honor. Let me first lay out the two questions here, and then I'll turn to credibility in your question directly. Now, the two questions before this Court, the agency again denied asylum withholding removal and CAT protection, asylum because of untimeliness and no ineffective assistance of counsel to excuse it, and the remaining claims based on an adverse credibility determination. Now, I'll get into the adverse credibility determination in more detail later on, but at the outset, let me address your issue. I do believe there's a factual- It's not my issue.  It may be an issue, Your Honor. At this point, I don't have any issues in these cases. I do believe the facts are a little bit wrong there, Your Honor. We don't have, first of all, the factual basis of the two claims, and specifically the inconsistencies that support the adverse credibility determination. Those were not present, as I understand it, in the parents' asylum application. In fact, all we have from the record is the parents' asylum application, and I believe there's a one-page decision granting that. So the testimony that petitioners have given in this case regarding their asylum application and all of the inconsistencies between those two are something that exists only in this case. Now, if you're talking about the actual merits of the claims themselves, well, first of all, those things happened to the parents, not to the children, and the children, in addressing those exact same claims, when they described the harm that they themselves suffered, and of course, they bear the burden of proving that they themselves suffered persecution or have a well-founded fear. They weren't able to consistently discharge that burden by testifying consistently with their asylum applications. So that's the manner in which we believe it is very different from the parents' asylum application, Your Honor. We don't know whether or not, presumably, they testified credibly to parents because they obtained asylum, but we don't know what relationship there was between their asylum application and their testimony. And we do have a... But nobody charged, nobody raised the question of their credibility, or if they had, they wouldn't have gotten... No, Your Honor. They wouldn't have gotten asylum. We don't mean to suggest now, certainly not after the fact, that there was a credibility issue there. What I mean to bring up before the Court is that we don't even know the relationship. Presumably, it was fine, but we do know that there's a relationship here, and a bad one, between the testimony of petitioners and their asylum applications. Now, I will get, again, I'll get to the adverse credibility determination in more detail. I'd like to start with asylum, because that's kind of a threshold issue here, is that petitioners fail to file their asylum requests in a timely manner. Now, they claim the ineffective assistance of counsel excuses that untimeliness. At the outset, it's important to note the Court's jurisdiction here is limited. The Court can only review this determination to the extent that it involves applying the law to undisputed facts. Now, we contend that the facts here are very much in dispute, but even assuming jurisdiction, we also contend that looking at the ineffective assistance claim on the merits itself also is completely without merit. And that's for the very same reason that the facts are in dispute, which is that there's very, very little evidence or detail submitted in support of petitioners' ineffective assistance claims. Now, you look at the Board's decision that denied ineffective assistance based on the failure to comply with a matter of lazada factors. In particular, the factor that petitioners set forth a detailed affidavit regarding their agreement with counsels. Now, petitioners acknowledge, they concede that there is no such affidavit, no such agreement that they have submitted on behalf of any of the individuals against whom they allege ineffective assistance. But they claim that the matter of lazada factors don't apply rigidly. Well, that's true, Your Honors. But they don't apply rigidly only if ineffective assistance is plain on the face of the record. And that is simply not the case here. There's so little evidence here from which to determine ineffective assistance. It's simply not established on the record. Now, you have three individuals against whom petitioners claim ineffective assistance. First, Mr. Finnegan, who represented petitioners before the immigration judge, can't even form a basis to excuse untimely asylum because he was not retained until a year and a half after they entered the country. So six months after their asylum deadline had already passed. So the thrust of their ineffective assistance claim proceeds against two individuals. Mr. Markman, Alexander Markman, whom Martique, the male petitioner, allegedly hired while he was in detention soon after entering the United States. The only details we have regarding Mr. Markman are that he came to visit Martique in detention. He allegedly did not ask him any questions or any background information regarding his persecution claim. And then he represented him at an interview with a DHS official a few days later. That's the extent of it. We don't know what he agreed to do, in fact. We know that we don't have an agreement regarding his representation. We don't know when he stopped representing him. And we don't know what, if anything, Mr. Markman did for Martique beyond the interview with a DHS official. Now, believe it or not, Your Honors, there is even less details and evidence regarding the second individual, for whom we only have a potential first name, Max. This is apparently a paralegal who advised Christine at some point to wait before filing her I-730 petition. That is the extent of what we know about this individual. We don't know a last name. We don't know for sure that that's the first name. We don't have a phone number, street address, law firm, any information regarding this individual. So again, going back to the jurisdictional question, are there disputed facts here? Absolutely. Again, what did any of these individuals do for petitioners? When did they do it? When did they stop doing it? What did they agree to do for them? All of these, Your Honors, are open questions that constitute disputed facts, and under those circumstances, the court lacks jurisdiction to review that determination. But again, even assuming the court can review that determination, the very same factual uncertainties and disputes militate against the ineffective assistance claim on the merits. There's simply no basis for that determination on the record. Now, turning now to the adverse credibility determination, Your Honors, petitioners each rely substantially, and effectively, they rely exclusively on single incidents to underlie their respective persecution claims. Now, Christine, the female petitioner, could not consistently describe that one incident with regard to the identity of the attackers, the number of the attackers, the nature of the harm and the injuries she suffered. Now, with Christine, this was an alleged January 2000 incident. She alleged in her testimony that five FETIs or FIDEEN officers attacked her, but in her asylum application, she said that it was ten police officers and five Yoruba officials. She testified that she was struck by these attackers by hands and feet. In her asylum application, she said she was additionally struck with rubber clubs. And in her testimony, she said she suffered injuries to her teeth and to her back. In her asylum application, she said she had injuries to her hips. Now, Your Honors, this is the one incident in which the female petitioner, Christine, bases her persecution claim. Now, frankly, I don't know how you can suggest that when she can't, in the one incident, she is asserting persecution. It's a dangerous opening statement. It is, Your Honors, but we believe the evidence. Sometimes we write and you get the answer to that, so why don't you tell us what you want to tell us. I'll tell you, Your Honor. How can you suggest that when there is simply one incident underlying the female petitioner's persecution claim, that when she cannot consistently describe the number and identity of attackers, the nature of the harm, and the injuries that she suffered, how that could not go to the heart of her persecution claim? Well, you know what your opponent's going to say in response to that, because she's already said it. What she thinks is, when you're being beat, you don't really keep a record on how many people and who are you. You just know somebody's beating you up. And when pressed, according to her, you'll give an answer if the government is requiring you to give an answer, but it may not be an accurate answer. And if you do, and if it isn't accurate, that, in her view, is not a basis for the Court on Appeals to say she's not telling the truth, because the question, so far as she's concerned, is, was there beating? Once you get to the point, yes, there was, then that's enough, whether there were three, six, whatever. How do you answer it? Your Honor, this is how we answer it. There's a couple points here. First of all, kind of broader picture, petitioners ultimately bear the burden of proving eligibility for relief and protection. And we know that that burden is discharged by providing specific, detailed, and consistent evidence, even if not precise, consistent evidence. So that petitioners approximated some of their claims with regard to how many people attacked them in these various incidents. That's not a problem. The precision is not the issue here. When you approximate, we would expect some level of consistency. And just to clarify, Christine was asked by the immigration judge to approximate how many individuals attacked her. Martique, on his own, offered the number to approximate those. Now, it's again important that petitioners offer this evidence. It's their burden to demonstrate eligibility for relief and protection. And it's also important to note, part of the problem here, Your Honors, and this is the problem raised by the immigration judge, is it's not- What your opponent is going to ask is, what your opponent says is, what is material here? Is that a beating took place? Does the government deny that that was a beating? Your Honors, because of the nature in which petitioners offer their testimony, and specifically the inconsistencies between those allegations and what's provided in their asylum application, that's exactly what the government is alleging here, that it is fatal to their credibility. We don't know what took place because of such substantial inconsistencies. Now, the immigration judge specifically warned petitioners, and this gets to, Your Honors, some of the ineffective assistance claims that petitioners raise are against the individual, Mr. Finnegan, who represented them before the immigration judge. The immigration judge specifically warned both petitioners that their asylum statements were incredibly limited. This is on page 409 of the record. So this, and they never supplemented those, the immigration judge specifically warned them that if they didn't supplement their asylum statements, it would be very hard for them to establish credibility under this court's jurisprudence, let alone to meet their ultimate burden of proof. Despite that, they didn't supplement their asylum statements, and a lot of the inconsistencies here do go to inconsistencies between the testimony and the asylum statements. And conceitedly, it would be easier to reconcile some of these inconsistencies had petitioners offered more evidence, exactly as the immigration judge warned them in their asylum statement. But because they did not, the failure to testify, even consistently with the few details provided in their asylum statement, is fatal to their credibility. Now, we won't discuss the female petitioner, Your Honor. With regard to the male petitioner, Martique, you're looking at very similar inconsistencies. Now again, he relied largely on a single incident, an April 1995 alleged attack on a religious gathering. Again, like his sister, he could not consistently describe the identity or number of attackers or the injuries suffered. He said that it was five, I believe, fedis or fidayeen, an unspecified number of police officers, and then later said that it was Yoruba officials in the asylum statement. Your Honor, on this point, my colleague here has now once again mentioned a claim that she raises in her opening brief and the petitioners raise in their testimony, which is that these two groups of individuals who are described very intentionally and very differently at several points in their testimony and asylum application are effectively the same group. It's worth noting that there's simply nothing in the record to prove that, despite the fact that my colleague now has mentioned the records twice and in her opening brief specifically references an excerpt in the record in the country reports on page 494 to 500, saying that that substantiates that these groups are the same. Those two groups aren't even mentioned in that excerpt of the record. So, Your Honors, ultimately the question is, you've got two claims here, two large incidents underlying these respective individuals' persecution claims. They could not consistently identify central aspects of those respective incidents. Does that, on this court standard review, compel the conclusion that they were credible? And we simply don't believe that it does. Now, I'd like to just briefly address at the end, Your Honor, the I-730 petitions. This is something raised near the very end of petitioner's lengthy opening brief. Petitioner's parents were granted asylum. Petitioners did not submit their I-730 petitions in a timely fashion, and the service denied those petitions. Now, they tried to submit those petitions again before the agency. Agency lacks jurisdiction to review those petitions, and so the court lacks jurisdiction to review that. The regulations make clear that I-730 petitions are filed with the service directly or under only certain circumstances with the immigration court, and those circumstances are when they involve the underlying proceedings, as in the parent's asylum application. I think you're past your time. Your Honor, I believe I have a minute and 20 seconds of what I'm showing. Sorry, Your Honor. No, it's the color of the lights that I'm confused about. Oh, I'm sorry. I have a yellow light and a minute and 15 seconds, but I'm ready to wrap up in any case. But, Your Honor, it's worth noting just to assure the court, the service denied petitioner's I-730 petitions based on a very clear reading of the Child Status Protection Act. Petitioners simply turned 21 before the act's effective date. What your opponents are going to say when she comes back here is that the wrong standard was used. Do you have any answer to that? With regard to which issue, Your Honor? In other words, let's see, what did she say? I made a statement about it. If you're referring to asylum, Your Honor, to the atonement asylum? That's just factually wrong. The board laid out that there's a clear and convincing evidence standard to demonstrate that your asylum application is filed in a timely manner, but then the standard of the burden for demonstrating exception is to the satisfaction of the Attorney General, and that's made very clear in the board decision. That's just based on a misstatement of the record. All right. I knew you wouldn't get to come again, and I know that you do. Thank you. No, I appreciate the thoroughness, Your Honor. We just want the record to show what the petitioner said. Yes. Yes, Your Honor. Ultimately, Your Honor, this case involves an untimely asylum claim and simply no evidence of an effective assistance to overcome it and an adverse credibility determination, which is substantially supported by the record, and this court's question on review is does the record compel the inclusion that the petitioners are credible, and we simply don't believe it does. We therefore ask that the court deny this petition for review. Thank you. Thank you. We'll hear a rebuttal. Your Honors, Judge Bybee, Judge Noonan, first of all, I'm so glad that counsel agreed that the parents were persecuted, because under Jailen v. Ashcroft, no personalized evidence needs to be submitted at all for these petitioners to be found eligible for asylum. That standard should have been applied and wasn't. For that reason, this is a reversible error. In terms of the disputed facts, there are no disputed facts in the record. The only thing they claim is that the judge asked for more evidence. He required cooperating evidence. Under the law in this circuit, that's the wrong standard. Under Kaur case, K-A-U-R that I cited, under the Salaam case that I cited, the testimony of the applicants are sufficient. In addition, under the case which I'm about to cite, the declarations that were submitted which claimed ineffectiveness of counsel, unless the government can show that they're inherently, and I'm looking for my site, it starts with a K, unless the government can show that they're inherently unbelievable, they must be accredited credibility. And those statements about all of the ineffective assistance of counsel that they got. And I'm citing, it's here, Your Honor, I know it's here. I'll come back to it. Next point. Oh, here it is, Your Honor. Garamani v. Gonzalez, G-H-A-H-R-E-M-A-N-I, which held that these facts are not in dispute. And they're not in dispute both because they use the wrong standard by requiring cooperating evidence, that's my argument, but in this one it says the ineffective assistance of counsel is established by the declarations unless there's some inherent lack of credibility, which there isn't in this case. It's very believable that the government gave the runaround to an unrepresented alien. And it happens like 90% of the time, even to attorneys, and that they were told the wrong information. The fact that they relied on it is corroborating the record because the mother only applied the I-730 for one child. She loved both children, but as the testimony shows, that was because they believed he was already given asylum. That's what he was told by the government. They relied upon that. It's a reasonable basis to rely on. Going to the standard of proof, Your Honor, the standard of proof is minimal, and not changes the filing for withholding of deportation. For that reason alone, this needs to be reversed for a finding on withholding of deportation using the minimal standard because of the family persecution and because of the disfavored group. And the government, the court acknowledged those, but didn't feel like paying any attention to them. In fact, the court himself said he wasn't paying attention to the case. He wasn't listening. So if you look at CR page 433, he said he wasn't paying very close attention, and that's really obvious. We ask you to reverse these cases and send them back with a finding that the one year was met or was accepted, that there was no basis for the lack of credibility finding, and that the asylum withholding and CAT needs to be reexamined. Thank you, Your Honor. Thank you. The case just argued is submitted.
judges: Farris, Noonan, Bybee